You're here twice today, I guess. You're up first, and let me tell you now, I'll tell you once for both of your cases, but thank you for serving under the Criminal Justice Act. As you know, the court certainly appreciates that work that you and many others do, so thank you. You can raise that lectern if you want. There's somewhere there, there's a button. Judge Riley, it's a pleasure to be back to Omaha. This morning, you're right, I do have two cases. The first case is in regards to Mr. Dante Glinn. Mr. Glinn went to trial on a charge of theft of a firearm from a federally licensed firearm dealer. At the time of trial, the defense had requested an instruction setting out the elements of the offense. One of the elements, I think, which is basic, is that when one commits a theft, that person has the intent to permanently deprive the property owner of that property. That requested element was not given. There is really no analysis by the in not giving that element, but the defendant was convicted. At the sentencing of Mr. Glinn... Well, before you leave that, how do you distinguish Van Elsen where we said steal? I mean, I'm paraphrasing, but the word steal means depriving somebody of their property. Well, that case dealt with the U.S. Code 18-644. In that case, the employer had taken some of his employees' retirement funds that he was supposed to place into a retirement account and used that for his own personal purposes. Prior to trial, he paid it back. The issue at the trial was, would that type of evidence come in? Under that specific statute, that statute dealt with not only stealing, but converting the funds. When one looks at that specific statute, when dealing with employee retirement funds, this court said that the intent to permanently deprive of those funds was not necessary. In this case, which we label as theft of a firearm, there has to be an intent to permanently deprive the property owner. And your argument is that he didn't intend to permanently deprive the property owner of the weapon that the video shows that he snatched and took away? No, the defense at trial was that he was not the person identified in the video. The hand wasn't his? Is that what you're saying? Well, the fingerprints certainly weren't his that were found at the scene. Was it about his tattoos or something like that? Yeah, the person I pictured in the video had no tattoos on his arms, and Mr. Glenn had significant tattoos on his forearms, and that was shown to the jury. But assuming that was his arm, how could it ever not be an intent to permanently deprive when whatever arm reached over and grabbed the gun? Well, that is an issue for the defense in this case. The argument at trial wasn't the person that took the gun was simply borrowing it. That's not what we argued. The argument of the person that was borrowing it. Yes, and so the court then goes to, well, is it a structural error that requires a new trial where a critical element of the offense is not included, or is it harmless error? And in this case, the where in that case, materiality wasn't included in the offense in a, I think it was some kind of tax case or fraud case. And the Supreme Court in that case said, yes, it should have been included, but the defendant never argued that it wasn't harmless error. Judge Scalia, in his dissent, stated, well, when you take away, when you don't give the jury the opportunity to determine an element, you're taking away the right to a jury trial. And that's exactly what happened in this case. A basic element of the offense was taken away, and it deprived Mr. Glenn of his right to a jury trial. Okay, let's go to your sentencing issues. Yes, at sentencing there was a four-level increase. Mr. Glenn was sentenced, was convicted of a violation of 922 U, which is theft of a firearm from a federally licensed dealer. He was sentenced under 922 G, which is an unlawful user of drugs in possession of a firearm. Secondly, he was never charged with that offense. Had the government believed it had that evidence, it would have brought that offense. Third, here's what the evidence was that he was an unlawful user. At the time of his police interview, he said to the police, I'm not gonna lie, I've been smoking and, or I was smoking and chilling and hanging out with my girlfriend. Well, what I understood Judge Reed did, looks at the, for sentencing, by the time of sentencing he had an interview and in there he talked about using marijuana, I can't remember, but on some sort of a regular basis. So by the time it came to sentencing, she had the granted that wasn't what he was charged with, it wasn't what he was tried with, but by then she had that in the PSR. Well, that interview was done pre-trial services. So that was done to determine exclusively what his bond conditions should or should not be. Okay, but it wasn't presented at trial. It was not presented at trial. But she had that information. And she had it and she was told by four levels. It was information that was given to the pre-trial officer. But how do you get around with, you know, the Supreme Court has told us the sentencing judge can consider all the circumstances and consider anything that's potentially relevant to sentencing. And we as an appellate court are supposed to stay out of it. Well, there are restrictions on what a sentencing court can use. And in my brief I said I couldn't find any directives from pre-trial services information placed into a pre-trial services report to use to increase a person's sentence. But since then the government has shown to me what's called the Guide to Judiciary Policy. And I'm going to go to a specific section that deals with pre-trial service interviews. And in Part 1, Paragraph C, regarding the objective of the confidentiality of pre-trial services information, it states, quote, disclosure of pre-trial services information for purposes other than the determination of pre-trial release, particularly for prosecution purposes, would deter defendants from cooperating with pre-trial services officers. So in this case, on the day he were arrested, pre-trial services goes to interview the defendant about his bond information. No attorney. He was in jail. No Miranda. How long have you been using? And he said, I haven't used in five months, by the way. And it was once a week. But then they take that information that is supposed to be confidential, according to the judiciary policy, and then they use it to increase his sentence. And that judiciary policy prohibits that reason for that type of information being used. It deters defendants. So what's a criminal defense lawyer supposed to do now when that officer goes to interview that defendant, knowing that anything that he says is going to be used against him, as it was in this case, at times of sentencing? It puts the defendant and it puts the defense lawyer in a difficult position. And that's why it is . . . How do you distinguish then, Judge Reeds, you know, she's one of our judges that use these alternative sentences most of the time. So what difference does all of this make if she said under 3583A it'd end up the same place? Okay, well, my time is running out. Go ahead and finish. In that case, well, in this very case, the four-level difference was significant. It led to almost a 50% increase in Mr. Glynn's sentence. When she made that statement, when the district court made that statement, that I would give the same sentence no matter what the Eighth Circuit finds that I was right or wrong, there was no reasons given. There was no reasons in support of that upward variance. And this court has stated over and over and over again that if there is a variance, particularly one that is significant, there has to be significant reasons for that variance. And in this case, there wasn't those reasons given. It was simply if I'm determined to be wrong at the Eighth Circuit, I would have given the same as 3583A. That's it. End of analysis. And that isn't sufficient to vary upwards by approximately 50%. Thank you, Your Honors. Thank you. Okay. Ms. Neidl? Yes, Your Honor. May it please the Court. Emily Neidl from the Northern District of Iowa. I'm here this morning asking that you affirm both this and the judge's sentence in this case. I'll start where Mr. Sheets left off. He indicated that the judge indicated that her sentence would be 78 months and she gave no reason for that. I would submit that the record is inconsistent with what Mr. Sheets just indicated. At sentencing, the government put on evidence of some shootings that had occurred during August. Specifically, Terrell Taylor testified at sentencing. The judge made findings with regard to that. She indicated that her concerns were based on that. So I think, are the findings necessarily right next to that indication that she would have given the same sentence? No. But she does, as part of her statement of what sentence she's going to give, she goes through an explanation that this defendant's conduct is increasing, that he's becoming more dangerous. She references in that that he's a drug user, evidenced by the fact he's making these irrational decisions. So she does lay that out. I think in the 60s of the sentencing transcript where she kind of fully lays out why she thinks that sentence is appropriate, why the alternative sentence is appropriate. I would note that that specific finding by the court wasn't raised as an appellate issue in this particular case. The defendant raised multiple sentencing issues, but he didn't use the reasonableness of that 78 month as an alternative sentence. He objects to the findings as far as how the court got to that calculation. I would note also back to a statement that Mr. Sheets made with regard to the defendant being sentenced under the 922 G section. I would disagree with that characterization. 2k 2.1, which is the sentencing guideline for firearm sentences, essentially says start at the top and work your way down. Pick the greatest, apply the greatest. So it starts with people who have violent felonies. If you don't have violent felonies, you continue down, you continue down. The first section you get to that applies to this defendant is the user in possession. Both the guideline section itself, as well as the note that deals with it, says yes, one way that you can fall into this category is you're convicted of a 922 G, but it also referenced just being a drug user. In this case, the court went through an analysis on whether or not this defendant was a drug user. Now her primary reliance was on the defendant's statements where he said to an officer after being arrested, I'm not going to lie to you. What I do with my time is I That reference of smoking we know is something more than just cigarette smoking. The officer testified to that. Judge specifically found that he was talking about more than cigarettes, that he was talking about marijuana. She had the opportunity to listen to the recording of that interview, as well as speaking to the officer. So based on that, we are then in, I believe it's A6, is the stolen firearm then comes into play. That's an appellate issue raised here, and because of the way the guideline reads, that section applies. That is a rational way to sentence someone because we're looking at all the different factors. So for this defendant, when we're looking at factors with regard to him, we have that he is a user, so that gets him at a certain category, in this case 14. The fact that the stolen firearm makes it worse, so he gets the two-level bump up because of that. We'd note that he also received a four-level bump for being in connection with another felony offense. We'd note that if the stolen firearm increase and the user in possession were not used, we would still be at a level 18 because of the way the guidelines read. If you don't, if you aren't to an 18, if it's in connection with another felony, we'd still be there. But again, essentially, the sentence still comes back to the court said, based on all the factors, I believe that a 78-month sentence is appropriate. We would ask you to affirm that. The court also gave the defendant an alcohol condition. We believe this was appropriate. When looking at the 8th Circuit case law, there have been multiple cases that kind of looked back and forth at some different time distinctions that an individual could be using. We talked about monthly, we talked about a couple times a month or a couple times a week, weekly, but the issue that essentially those cases came down to was do we have someone that's drug dependent? In this case, while we had the admissions of the defendant during the pretrial service interview where he indicated that he was smoking weekly, there were also several other factors that made that alcohol condition appropriate. The defendant himself, as part of the PSR, indicates that he thinks that he needs treatment because he has a desire, he needs to stop the desire to use marijuana when on the streets. That's in paragraph 76. So he himself has basically said, I'm a drug user that needs help. The defendant has alluded to most of this in her decision-making with regard to this condition, that the defendant had a recent conviction for crack cocaine in 2015, that the admissions that had been made to Officer Bosenberg, that this defendant had two convictions for marijuana. Now these were in 2002, but I think this supports the finding that when the defendant says, I'm not going to lie to you, I smoke, he's actually talking here about marijuana, evidenced by his that he had used alcohol while still underage and therefore illegal, and that he'd used it until he was buzzed multiple times. The admissions with regard to his weekly marijuana use, he indicates again in the PSR, when asked about marijuana, I have used marijuana but I'm not going to answer any further questions on advice of my counsel. There's also indications of at least an The court makes the finding that, and states that in order to be completely clean and sober, you can't be using alcohol. That if you don't have the option for alcohol, then you're instead in the circumstance where you may substitute. She doesn't use the term cross-addiction, but would note that the PSR, specifically at paragraph 95, does use the language of cross-addiction. I continued use, evidenced by his arrests and his statements, put this defendant more consistent with the defendant in the Ford case, Mr. Tolliver. Mr. Tolliver talked about daily use. I think that's more consistent with the defendant's description to Bozenberg with his use. Mr. Tolliver also had multiple arrests for weed and coke, similar to Mr. Glynn, and the court indicated in that, that it was concerned about this use of substance. Now, turning to the jury instruction issue, note that defense makes it sound like his case would have been significantly different, or he would have been acquitted with this jury instruction. I think, as admitted by counsel, this case was a case about whodunit. In this case, we had a video where Mr. Glynn goes into a store, he goes to the counter, he reaches into the counter, he grabs a firearm, he's then seen running out of the store. I think the video itself would have indicated that this was not a case where the potential return or the intent to permanently deprive was any question. As we watched the defendant be in such a hurry to leave the store that he actually leaps over a railing and begins to run away. Based on those facts, we believe, and the Van Elsen case, we believe it's appropriate that this instruction was not given, that there was no error at all. If there was an error, that it was a harmless error based on the circumstances and facts in this case. And we believe that the court's sentencing was appropriate, that this defendant was indeed a user in possession, that she used only appropriate information, that based on comment eight, it was appropriate that the stolen firearm exception, or not of non-guideline sentence, was appropriate, and based on her court's findings and the information provided in the transcript from 60 to 62, this was an appropriate sentence of 78 months. Thank you. Okay, thank you. Mr. Sheets, you're out of time, but if you have something really burning, come on up. I'll set a maximum on of one minute, but maybe you can do it in less. Your Honors, regarding the supervised release condition, the condition has two parts. One is no alcohol, and the second is, you can't even go to a bar or an establishment that sells alcohol. So, like last November, when I went to watch the Iowa-Nebraska football game, when Iowa I didn't go there to drink, I went there to watch the game with my friends, and in fact, I didn't drink. So, there's two parts to this condition that are very burdensome to this defendant, who is a young man. So, based upon this statement to the police where he says, I smoke, I don't know if that puts it up to that level. Of course, if it had been somebody except like you, who with an iron will, you could have drunk, couldn't you, while you were watching the ill-fated football game? Well, there's a lot of people that do go out and hang out with friends and don't, and if they have an order not to drink, you have to quite what we have here, somebody who had drunk and used marijuana, or you're saying that that probably isn't the case? I can't remember his drinking history. I don't think it's severe. I know there's no alcohol-related offenses. She said that related addictions or cross addictions and so forth, and we, do we use our general knowledge of that kind of stuff, or do we have to kick it aside? I don't have any specific knowledge of cross-addiction issues. All I know in this case . . . I thought the judge said in some way that she was concerned about cross-addiction. She said he used marijuana, and so that was part of the limitation on the alcohol, wasn't it? That was the court's analysis, yes. Okay. Thank you. Thank you. Your arguments, except for the Nebraska-Iowa-UK, were very well done. We appreciate that, and we'll take it under advisement. So, thank you.